No. 106,210

STATE OF KANSAS, *Appellee*, v. CHRISTINA MIKA ISABEL ORTEGA, *Appellant.*

(335 P.3d 93)

Opinion filed October 3, 2014. Review of the judgment of the Court of Appeals in an unpublished opinion filed January 11, 2013.

*Randall L. Hodgkinson,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Tamara S. Hicks,* assistant county attorney, argued the cause, and *Jennifer V. Cunningham,* assistant county attorney, *John P. Wheeler, Jr.,* county attorney, and *Derek Schmidt,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: On petition for review of a decision of the Court of Appeals, we consider Christina Mika Isabel Ortega's appeal from her convictions of attempted aggravated interference with parental custody and disorderly conduct. The Court of Appeals found several of Ortega's nine issues lacked merit but found multiple trial errors. Nevertheless, the Court of Appeals affirmed Ortega's convictions after a majority of the Court of Appeals panel concluded these errors did not deprive Ortega of a fair trial. *State v. Ortega,* No. 106,210, 2013 WL 192714 (Kan. App. 2013) (unpublished decision).

Before us, Ortega argues the Court of Appeals erred in rejecting some of her claims of error and, where it found error, in determining that she was not deprived of a fair trial. The State did not file a cross-petition asking us to revisit any of the Court of Appeals' determinations of error.

We reject Ortega's arguments that there were additional trial errors beyond those found by the Court of Appeals, but we agree with Ortega's arguments that two of the errors, both relating to her defense of ignorance or mistake, were sufficiently prejudicial to warrant the reversal of her conviction for attempted aggravated interference with parental custody. This prejudice did not taint

Ortega's conviction for disorderly conduct, however. Nor do any other claimed errors. We, therefore, affirm the Court of Appeals and district court in part and reverse in part.

## FACTS AND PROCEDURAL BACKGROUND

The charges against Ortega stem from an incident in August 2010 at Kenneth Henderson Middle School in Garden City, where Ortega's 14-year-old daughter, V.O., was a student.

In the weeks before the incident, Ortega had been in Colorado. She had left her children, including V.O., with her mother. Despite Ortega's original intention to stay in Colorado for just a few days, she remained for "a little over a month" because she lost her purse and did not have any money or identification. While in Colorado, Ortega did not have a forwarding address, but she called her mother twice a week from borrowed phones "to make sure that the children were okay."

Because Ortega left V.O. and was gone for 6 weeks, a child in need of care (CINC) petition was filed. On August 30, 2010, the Finney County District Court held a CINC hearing. Ortega's mother attended the hearing, but Ortega was not present. The court issued an order removing V.O. from her grandmother's home and granting custody to Social and Rehabilitation Services (SRS). Subsequently, SRS placed V.O. in foster care with Saint Francis Community Services (St. Francis).

There was evidence that Ortega was unofficially aware, at least in general terms, of the court order because her mother testified that she informed Ortega that V.O. was in SRS custody or foster care when Ortega called to check on the children. There is no record of whether Ortega was officially notified of the CINC hearing or received a copy of the order or any other paperwork regarding V.O.'s custodial status. The first documented contact between SRS and Ortega occurred on September 9, 2010.

Ortega had returned from Colorado on the evening of September 8, 2010. Her mother told her "[t]hat the children were taken from her and that [Ortega] could go pick them up." Ortega's mother did not know that Ortega could not pick up the children.

Ortega went to Kenneth Henderson Middle School on the morning of September 9, 2010, to see V.O. Ortega entered the front office and reported to the school's attendance secretary that "she had a good job in Colorado" and "was there to take [V.O.] with her to Colorado." Ortega, who appeared upset and nervous, also told the attendance secretary "how unhappy she was with this f***ing state" and mumbled something about St. Francis.

The attendance secretary pointed to the "Student Check-Out Sheet" and told Ortega school policy required a parent to sign the sheet if they wanted to take their child out of school. The sheet included the following columns: "Date," "Student's Name," "Reasons for Leaving," "Time Left," "Checked Out By," and "Time Returned." The attendance secretary saw Ortega sign the sheet and fill it out by writing: "9/9," V.O., "going out of town," and "11:00 p.m." In addition, Ortega mistakenly signed the teacher "Sign Out Sheet," which includes the following columns: "Name," "Reason for Leaving," "Date," "Time Out," and "Time In." Ortega filled out the sheet as follows: V.O., "trip," "9/9," and "8:49." The attendance secretary did not see Ortega fill out this sheet.

The attendance secretary was hesitant to release V.O. to Ortega because she knew V.O. was in foster care through Saint Francis. The secretary went to the associate principal to discuss the release of V.O. While the attendance secretary was talking to the associate principal, the school's head secretary saw Ortega and asked Ortega if she needed help. Ortega replied that she was there to get her daughter. The head secretary asked if it was for an appointment, and Ortega indicated she was taking her daughter out of town and mentioned Colorado.

The associate principal summoned the school resource officer and another school secretary to assist in determining whether V.O. should be allowed to leave with Ortega. Meanwhile, the associate principal went to V.O.'s classroom to tell V.O. her mother was there. V.O. reported she was in foster care, was not allowed to have contact with her mother, and would not leave with her mother. The associate principal went back to the front office where the school resource officer, who had called St. Francis, confirmed that Ortega did not have authority to take V.O.

The school resource officer went to the lobby where the campus supervisor had intercepted Ortega to ensure that she did not go anywhere else in the school. Ortega was yelling: "You white bitches can't keep me from my child"; "You white bitches have picked on the wrong . . . Mexican, and you going to regret this"; "[T]his f***ing school is nothing but a bunch of prejudiced people, including you Mother F***er"; "Kansas is black and white, and I'm Mexican, . . . F***ing Kansas is stupid"; and "Kansas doesn't know who they're messing with, . . . When Aztlan rises, we're going to take our lands back." The school resource officer called another police officer for backup. When the school resource officer told Ortega that V.O. was in SRS custody and could not be taken, Ortega said angrily that "it didn't matter . . . she was going to take [V.O.] anyway" because "she ha[d] a house and a job in Colorado and she was going to raise her kids there, and that Kansas is not the place to raise kids."

The school resource officer told Ortega she had to leave the school and could contact St. Francis with any questions. The officer thought Ortega might come back to the school because her parting words were: "[Y]ou're going to regret this. You're . . . messing with the wrong Mexican. . . . Don't worry, you haven't seen the last of me." Consequently, school officials locked every outside door except the front ones, which they monitored for the remainder of the school day. Ortega made no additional attempts to contact or see V.O.

The next day St. Francis contacted the Garden City Police Department to report that Ortega had been there. An officer found Ortega and arrested her. When the officer informed Ortega she was being charged with attempted aggravated interference with parental custody and disorderly conduct, she responded: "That was my goal, to piss everyone off."

At Ortega's trial, the jury heard from the various school officials and law enforcement officers who were involved in the altercation with Ortega. The jury also heard testimony from a social worker with Garden City SRS who testified about Kansas' child custody process. She described the process related to a child becoming a ward of the State, in particular the process in which V.O. was

placed in SRS custody. In addition, the social worker explained a biological parent cannot take the child out of town or state if the child is in SRS custody. The social worker testified that St. Francis, as a foster care provider under contract with SRS, is required to notify parents, if their whereabouts are known, within 24 hours of a SRS referral.

The jury also heard testimony through an interpreter from Ortega's mother. She testified that she thought Ortega would pick up V.O. but she did not think Ortega would take her to Colorado "because in Colorado she didn't have anywhere to live."

Ortega took the stand in her own defense. She testified that she was not aware V.O. was in SRS custody; her mother had merely told her that V.O. had been "taken away"; and she had no idea what "SRS custody" meant. Therefore, she did not know she could not have contact with V.O. or take V.O. out of school. Although Ortega told school officials she might be taking V.O. out of town, she explained to the jury that she "wasn't really planning on going anywhere" because she "didn't have any money to go out of town." Further, she testified that she had no intention of going to Colorado "in the immediate future" because she only had $10 in her pocket, no household belongings or suitcases packed in her car, and no home or job in Colorado. She explained that she just wanted to take V.O. out of school because she had been gone for over a month and did not want to wait until the end of the school day to see V.O.

Ortega further testified that had she been able to collect V.O., V.O. would have been back at school the next day. Ortega admitted she was upset, did not want V.O. to be in SRS custody, and "to a certain extent" would have done whatever she could to prevent V.O. from living in a foster home. But she would not have intentionally broken the law to get V.O. out of SRS custody.

The jury convicted Ortega of attempted aggravated interference with parental custody, in violation of K.S.A. 21-3301 and K.S.A. 21-3422a(a)(2)(C), and disorderly conduct, in violation of K.S.A. 21-4101. The district court granted Ortega's motion for durational departure and sentenced her to a controlling term of 10 months' imprisonment.

## Court of Appeals' Decision

Ortega filed a timely appeal with the Court of Appeals, raising nine issues: (1) Was the evidence sufficient to prove that Ortega performed an overt act toward taking her child out of state, a requisite to attempted aggravated interference with parental custody? (2) Is the interference with parental custody statute an alternative means statute, and, if so, did the State present sufficient evidence of each alternative means? (3) Did the prosecutor commit misconduct by vouching for witnesses? (4) Did the trial court err in using an outdated version of the pattern reasonable doubt instruction? (5) Did the prosecutor commit misconduct by misstating the law regarding the defense of ignorance or mistake? (6) Did the trial court commit clear error by failing to instruct the jury regarding the law relating to the defense of ignorance or mistake? (7) Did the trial court commit clear error by failing to instruct on the lesser included offense of attempted interference with parental custody? (8) Did the prosecutor commit misconduct requiring reversal of the attempted aggravated interference conviction by violating the trial court's order in limine? and (9) Should Ortega's convictions be reversed because of cumulative errors?

The Court of Appeals rejected Ortega's insufficiency arguments; held K.S.A. 21-3422, which defines the crime of interference with parental custody, did not state alternative means of committing the crime; and concluded the prosecutor did not commit misconduct by improperly vouching for the credibility of witnesses. But the Court of Appeals panel found several trial errors, including two instances of prosecutorial misconduct and three jury instruction errors. As to the prosecutor's misconduct, the panel held the prosecutor misstated the law regarding the defense of ignorance or mistake and violated a motion in limine. The jury instruction errors included a failure to instruct on the defense of ignorance and mistake, a failure to instruct on the lesser included offense of interference with parental custody, and the use of an outdated pattern instruction on reasonable doubt. The Court of Appeals majority determined none of the errors—either individually or cumulatively—required reversing Ortega's convictions. *Ortega*, 2013 WL 192714.

Chief Judge Malone dissented. He would have reversed Ortega's conviction for attempted aggravated interference with parental custody. In explaining his rationale, he first cited the trial court's error in failing to give the lesser included offense instruction, noting there was a substantial fact dispute about whether Ortega intended to remove V.O. from Kansas—the element that differentiates aggravated interference with parental custody from the lesser included offense of interference with parental custody. Applying the clearly erroneous standard for reversal, he stated that he was "firmly convinced there is a real possibility that the jury could have found Ortega guilty of the lesser offense of attempted interference with parental custody had the district court given the appropriate jury instruction." 2013 WL 192714, at *13 (Malone, C.J., dissenting). In addition, he concluded the prosecutor denied Ortega a fair trial by committing "gross and flagrant misconduct by blatantly disobeying the order in limine and by misstating the law on the defense of ignorance or mistake." *Ortega*, 2013 WL 192714, at *14 (Malone, C.J., dissenting). These errors required reversing Ortega's attempted aggravated interference with parental custody conviction, according to Chief Judge Malone, but "probably had no impact on the disorderly conduct charge." 2013 WL 192714, at *14 (Malone, C.J., dissenting).

Ortega filed a petition for review seeking this court's review of the Court of Appeals' decision. This court accepted review and has jurisdiction under K.S.A. 20-3018(b) and K.S.A. 60-2101(b).

In Ortega's petition for review, she argues the Court of Appeals erred in rejecting three of her claims of error, specifically her claims that (1) The evidence was insufficient to establish that she committed the offense of attempted aggravated interference with parental custody; (2) the crime of attempted aggravated interference with parental custody, which incorporates the elements of interference with parental custody, includes alternative means that were not supported by sufficient evidence; and (3) the prosecutor committed misconduct by vouching for the credibility of witnesses. In addition, Ortega argues the Court of Appeals erred in concluding that the three instructional errors and two instances of prosecutorial misconduct did not prejudice her right to a fair trial. Fi-

nally, she emphasizes that even if these errors were not individually prejudicial, cumulatively they justify reversing her convictions.

We have taken the liberty of reorganizing Ortega's issues to first discuss the three issues that were rejected by the Court of Appeals and then to discuss whether the Court of Appeals erred in concluding neither of her convictions should be reversed. We begin with Ortega's two insufficiency arguments, both of which relate to her conviction for attempted aggravated interference with parental custody.

## EVIDENCE OF OVERT ACT SUFFICIENT

In Ortega's first insufficiency argument, she claims the State failed to prove beyond a reasonable doubt that she made an overt act toward "leading, taking, carrying away, decoying or enticing away any child under the age of 16 years with the intent to detain or conceal such child from its parent, guardian, or other person having the lawful charge of such child" (K.S.A. 21-3422[a] [defining interference with parental custody]) or the additional element that makes the crime aggravated—"tak[ing] the child outside the state without the consent of either the person having custody or the court" (K.S.A. 21-3422a[a][2][C] [defining aggravated interference with parental custody]; K.S.A. 21-3301[a] [attempt]). Ortega argues the Court of Appeals erred in rejecting her argument and urges us to reverse her conviction for attempted aggravated interference with parental custody.

In considering this argument, we apply a well-known standard of review: "When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Raskie,* 293 Kan. 906, 919-20, 269 P.3d 1268 (2012) (citing *State v. Ward,* 292 Kan. 541, 581, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012]; *State v. Northcutt,* 290 Kan. 224, 231, 224 P.3d 564 [2010]). In evaluating the evidence, " '[t]he appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence.' " *State v. Spear,* 297 Kan.

780, 791, 304 P.3d 1246 (2013) (quoting *Raskie*, 293 Kan. at 920); see *State v. Lowrance*, 298 Kan. 274, 296, 312 P.3d 328 (2013); *State v. Ta*, 296 Kan. 230, 237, 290 P.3d 652 (2012).

Applying this standard, the Court of Appeals panel stated that "a rational factfinder could have found that Ortega performed the first step in a direct movement toward the crime by going to V.O.'s school, and a subsequent step toward the crime by filling out the sign-out sheets." *Ortega*, 2013 WL 192714, at *10. In addition, the panel determined that Ortega's comments to the school officials provided evidence that she performed these acts with the intent to take V.O. to Colorado.

In Ortega's petition for review, she asserts the acts of visiting V.O.'s school and filling out the "Student Check-Out Sheet" did not constitute a "direct movement towards the commission of [aggravated interference with parental custody] after preparations are made" because she did not have any belongings packed, had no money for gas, and did not have a house or job lined up in Colorado. In making this argument, Ortega implies that the elements cannot be established by circumstantial evidence, the State must prove a specific sequence of direct movements toward the commission of the offense, and, in this case, the State had to prove that Ortega did everything but drive across the state line.

Contrary to the first of these suggestions, "[i]t is well established that a conviction for even the gravest offense may be sustained by circumstantial evidence. [Citation omitted.]" *Lowrance*, 298 Kan. at 297. In finding there was circumstantial evidence of an overt act, the Court of Appeals relied on *State v. Peterman*, 280 Kan. 56, 118 P.3d 1267 (2005), which also answers Ortega's arguments about the sequencing of overt acts.

In *Peterman*, this court explained: "Kansas law does not provide definitive rules as to what constitutes an overt act for attempting crime. The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. [Citation omitted.]" 280 Kan. at 60-61. The *Peterman* decision also made it clear that the State does not need to prove "the

last proximate act in the consummation of the crime." 280 Kan. at 61.

Applying these principles to this case, Ortega focuses on circumstances that suggest she was not going to immediately leave the state. She essentially argues that even if sufficient evidence of attempted interference with parental custody was presented, there was no evidence of the element that distinguishes that crime from its aggravated form, *i.e.*, removing the child from the state without the permission of the custodian or a court. This ignores the obvious need for Ortega to have had V.O. with her when she left Kansas in order for the State to establish the elements of the completed crime of aggravated interference with parental custody. In other words, having physical custody of V.O. was a necessary step toward the completion of the crime of aggravated interference with parental custody.

To gain physical custody of V.O., Ortega had to physically remove V.O. from St. Francis' control, and removing V.O. from school presented an opportunity to do so. Thus, Ortega's act of going to the school and complying with the school's requirements for signing a student out were overt acts of gaining physical custody of V.O. See, *e.g.*, *Lowrance*, 298 Kan. at 297-98 (defendant's act of virtually carrying the victim to his car and driving her to a place where they could be alone, combined with the fact that the victim was legally intoxicated, was sufficient evidence of an overt act); *Peterman*, 280 Kan. at 64 (defendant's act of driving to meet someone to pick up a child he intended to have sexual intercourse with constituted an overt act); *State v. Garner*, 237 Kan. 227, 239, 699 P.2d 468 (1985) (holding that the defendant committed an overt act toward the crime of attempted theft when he went to the owner's property to prepare cattle for shipment the next day).

In addition, Ortega's statements when signing not one, but two sign-out sheets evidenced her intent to gain physical custody of V.O. She wrote on one sheet that she was taking V.O. out of school because they were "going out of town" and on the other one that they were taking a "trip." Ortega even admitted in her trial testimony that she told the school secretaries she was going to take V.O. out of town.

Although this evidence related to the lesser offense, it established necessary elements of the greater offense because the lesser offense elements are included in the greater offense. Nevertheless, that evidence by itself would be insufficient to establish the aggravated form of the crime. But additional evidence established that when Ortega went to the school to gain physical custody of V.O., she did so with the intent of removing V.O. from Kansas. Specifically, school personnel testified about Ortega's statements that she planned to go to Colorado.

Consequently, even though Ortega had not taken all of the steps necessary to complete the crime of aggravated interference with parental custody by taking V.O. out of Kansas, she had taken a first movement toward the completion of the crime. The fact that these movements were also evidence of the lesser included offense did not preclude the jury from finding evidence of the aggravated offense, where an intent to commit the aggravated crime was established and the first step toward completion of the aggravated crime had occurred.

Accordingly, the evidence, when viewed in the light most favorable to the prosecution, was sufficient for a rational factfinder to have found Ortega guilty of attempted aggravated interference with parental custody beyond a reasonable doubt.

## NOT AN ALTERNATIVE MEANS CRIME

In a related sufficiency issue, Ortega points out the interference with parental custody statute lists several alternatives for committing the offense by stating it occurs by "leading, taking, carrying away, decoying or enticing away any child." K.S.A. 21-3422. These elements are incorporated into the offense of aggravated interference with parental custody. See K.S.A. 21-3422a(a)(2). She also notes that the jury was instructed on all these "explicit means." While conceding there is evidence of the first three alternatives—leading, taking, or carrying away—she contends the State failed to present any evidence establishing that she attempted the final two alternatives—"decoying or enticing away." Ortega argues the State was required to prove both these and all other alternative means contained in K.S.A. 21-3422. See *State v. Wright*, 290 Kan. 194,

Syl. ¶ 2, 224 P.3d 1159 (2010) (in alternative means cases, jury needs not be unanimous as to which means defendant utilized but there must be substantial competent evidence of each instructed means), *overruled on other grounds by State v. Nunez*, 298 Kan. 661, 316 P.3d 717 (2014).

The Court of Appeals held that K.S.A. 21-3422 does not state alternative means; instead the listed alternatives merely describe the factual circumstances that could prove the gravamen of the crime—removing a child from lawful custody. *State v. Ortega*, No. 106,210, 2013 WL 192714, at *11-12 (Kan. App. 2013) (unpublished decision); *cf. State v. Wiggett*, 273 Kan. 438, 444, 44 P.3d 381 (2002) (stating in the discussion of the crime of interference with parental custody that the "removal of the child from his or her parent or lawful custodian must be accomplished with the specific intent to detain or conceal the child").

Ortega asserts that the Court of Appeals erred in its determination that the gravamen of the offense is removal from lawful custody because removal is not an element of the crime. She contends that the "only listed elements are the alternative acts of 'leading, taking, carrying away, decoying or enticing away any child.' "

Ortega's argument is partially correct. Without question, the word "remove" is not in the statute. But removal is implicit in several of the words or phrases in the statute, including leading, taking, carrying away, and enticing away. Each implies a physical movement from one location to another—a removal. But "decoying" does not require movement or removal. Nevertheless, the full requirement is to decoy the child with the intent to "detain or conceal" the child from his or her legal custodian. While expressing the *mens rea* requirement, these words convey the legislature's intent to prohibit an act of detaining or concealing a child from his or her lawful guardian. Arguably detaining or concealing a child from his or her lawful guardian is a somewhat broader concept than "removing" a child. The Court of Appeals' use of the word "removing" does not necessarily undercut its conclusion that the statute does not include alternative means, however.

To determine if K.S.A. 21-3422 includes alternative means, we must examine whether the legislature prohibited distinct alterna-

tive acts—the *actus reus* element—or distinct alternative states of mind that a defendant must have when committing the act—the *mens rea* element. *State v. Brown*, 295 Kan. 181, 195, 284 P.3d 977 (2012). If alternatives in the statute do not state an "additional and distinct material element" but merely describe a "material element or . . . factual circumstances in which a material element may be proven," the alternatives are not alternative means but "options within a means" and evidence of each option need not be presented to the jury. 295 Kan. at 196-97.

Here, the full context of the statute reveals the legislature defined the gravamen of the crime as detaining or concealing a child from his or her legal custodian. The alternatives state the factual circumstances that can establish whether an act was taken to detain or conceal the child—Ortega could have either led, taken, carried, decoyed, or enticed away V.O. in an effort to interfere with another's custody. See K.S.A. 21-3422.

Hence, we agree with the Court of Appeals that the alternatives in K.S.A. 21-3422—"leading, taking, carrying away, decoying or enticing away"— merely "describe the factual circumstances in which a material element may be proven." *Brown*, 295 Kan. at 196-97. As such, the alternatives are options within a means and not material elements constituting alternative means. See 295 Kan. at 197.

Thus, we need not reach the question of whether sufficient proof of each of the listed alternatives was presented to the jury. See *State v. Haberlein*, 296 Kan. 195, 208, 290 P.3d 640 (2012), *cert. denied* 134 S. Ct. 148 (2013); *Brown*, 295 Kan. 181, Syl. ¶ 11.

## PROSECUTOR DID NOT VOUCH FOR WITNESSES

We next turn to the last issue rejected by the Court of Appeals and consider whether the Court of Appeals erred in holding that the prosecutor did not commit misconduct by vouching for the credibility of the school employees. Citing *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011), the Court of Appeals correctly noted a two-prong test applied, the first prong of which requires an appellate court to decide if a prosecutor's arguments to a jury are outside the wide latitude allowed a prosecutor in discussing the

evidence. If the court finds misconduct under the first prong, it moves to the second prong and conducts a harmlessness test. While the Court of Appeals held the prosecutor committed misconduct during the trial, it rejected Ortega's specific argument that the prosecutor committed misconduct by vouching for witnesses' credibility. *Ortega,* 2013 WL 192714, at *9.

Ortega's argument is based on statements that occurred during the State's closing argument. While discussing the elements of disorderly conduct, the prosecutor pointed to the discrepancy in witnesses' testimony and reminded the jury that they are "going to have to judge the credibility of witnesses." The prosecutor continued stating:

"The defendant obviously has a reason for shading the truth in her direction; she doesn't want to be convicted of any crimes. But remember, witnesses came in here and they testified that they saw the defendant, they knew it was her, and they knew that she said these things. What reason do they have to lie to you? Perhaps somebody who might think, well, police officers do this all the time. I don't necessarily know why you would think that, but that's the most cynical possible thing I can think of. Well, set that aside. Do middle school secretaries come into court and lie all the time? Did Ms. Perez or Ms. Delarosa, the principal, have a reason to come in here and tell you that the defendant did something or said something that she didn't really do?"

In concluding these comments were not misconduct, the Court of Appeals reasoned that the prosecutor's statements were based on reasonable inferences drawn from the evidence, and the prosecutor was merely explaining what the jury should look for in assessing the credibility of the school officials. Thus, the statements were within the wide latitude afforded the State in discussing evidence. *Ortega,* 2013 WL 192714, at *9.

We agree with this reasoning. Although it is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, a prosecutor has " 'freedom . . . to craft an argument that includes reasonable inferences based on the evidence' " and, "when a case turns on which [version] of two conflicting stories is true, [to argue] certain testimony is not believable." *State v. King,* 288 Kan. 333, 352, 204 P.3d 585 (2009) (quoting *State v. Davis,* 275 Kan. 107, 121, 61 P.3d 701 [2003]); *State v. Pabst,* 268 Kan.

501, 507, 996 P.3d 321 (2000). For example, it is not improper for a prosecutor to offer "comments during closing argument regarding the witness' motivations [or lack thereof] to be untruthful." *King*, 288 Kan. 353; see *State v. McReynolds*, 288 Kan. 318, 326, 202 P.3d 658 (2009) (prosecutor may offer the jury an explanation of " 'what it should look for in assessing witness credibility' "); *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008) (same). But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. *State v. Akins*, 298 Kan 592, 607, 315 P.3d 868 (2014); *State v. Marshall*, 294 Kan. 850, 856-58, 281 P.3d 1112 (2012); *King*, 288 Kan. at 353; *State v. Elnicki*, 279 Kan. 47, 60-62, 105 P.3d 1222 (2005); *Davis*, 275 Kan. at 121; *Pabst*, 268 Kan. at 506-07.

Ortega argues that the prosecutor's statements are akin to those in *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010), where this court found the prosecutor's statement to be misconduct. In *Magallanez*, the prosecutor stated during closing arguments: " '[Y]ou trust children until you have a reason not to. We assume that. We assume we have taught them correctly.' " 290 Kan. at 914. This court held that this statement was unsworn testimony about the truthfulness of teenagers and children and improperly bolstered the credibility of the State's witnesses.

In contrast, this court has distinguished between bolstering witness credibility and proper comments on the evidence. For example, in *McReynolds*, the prosecutor stated in closing argument that " '[n]o police officer benefits from this investigation, no police officers benefit from concocting stories and making Mr. McReynolds agree to those stories.' " *McReynolds*, 288 Kan. at 325. This court determined that because the credibility of the police officers had been challenged, "the prosecutor properly offered the jury an explanation of 'what it should look for in assessing witness credibility.' [Citation omitted.]" Thus, the prosecutor's comments were within the wide latitude allowed to prosecutors when commenting on the evidence. 288 Kan. at 326.

Similarly, in *Scaife* the prosecutor stated: " 'Now, why believe Patrick Ross? Folks, you saw him, you've heard him from the very beginning of this case which was seconds after it began. Evaluate his testimony, evaluate his demeanor, evaluate what he told you, and you don't have any other conclusion.' " *Scaife*, 286 Kan. at 623. This court concluded that the prosecutor's statements were answering the defense's attack on Ross' credibility by explaining to the jury what it should look at when assessing that credibility. 286 Kan. at 624; see *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010) (prosecutor suggested evidence supported jury concluding witness was credible; argument was within wide latitude allowed in closing argument).

The statements made by the prosecutor in this case are more similar to the statements made in *McReynolds*, *Scaife*, and *Stone*. The prosecutor merely asked rhetorical questions that probed whether there was any motivation for the school employees to lie. Examining whether a witness has a motive to lie is a valid consideration in weighing credibility. See *McReynolds*, 288 Kan. at 326 (prosecutor's explanations to the jury about what it should look for in assessing credibility is not outside the wide latitude afforded the State); *Scaife*, 286 Kan. at 624 (same); *Stone*, 291 Kan. at 19-20 (same). Accordingly, the prosecutor's statements were within the wide latitude allowed the State when discussing evidence.

REVERSIBLE ERROR

Thus, we affirm the Court of Appeals' holdings on those issues where it concluded there was no error. We next turn to Ortega's issues where the Court of Appeals found trial error. The Court of Appeals found three jury instruction errors and two instances of prosecutorial misconduct.

The State did not file a cross-petition challenging the Court of Appeals' holdings that there was instructional error and prosecutorial misconduct. Hence, the question of error as to any of these issues is not before us; we only review the Court of Appeals' conclusion that the errors were harmless. See K.S.A. 60-2103(h) (to obtain appellate review of adverse rulings, appellee must file notice of cross-appeal); *State v. Novotny*, 297 Kan. 1174, 1181, 307 P.3d

1278 (2013) (same); *Cooke v. Gillespie*, 285 Kan. 748, 754-55, 176 P.3d 144 (2008) (same).

Ortega emphasizes the cumulative prejudice arising from the various errors and also urges us to adopt Chief Judge Malone's reasoning in his dissent regarding the prejudice individually caused by some of the errors that would have led him to reverse Ortega's conviction for attempted aggravated interference with parental custody.

*Reasonable Doubt Instruction Not Prejudicial*

We begin with an issue that has the potential to impact both convictions: Was the trial court's failure to use the current reasonable doubt pattern jury instruction so prejudicial it deprived Ortega of a fair trial?

This issue arises because the reasonable doubt instruction given by the trial court was identical to the pre-2005 version of PIK Crim. 3d 52.02 and stated, in part: "If you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.) See PIK Crim. 3d 52.02 (1995 Supp.). By the time of Ortega's trial, this portion of the instruction had been revised to read: "If you have no reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.) PIK Crim. 3d 52.02 (2005 Supp.).

The Court of Appeals panel relied on *State v. Beck*, 32 Kan. App. 2d 784, 785, 88 P.3d 1233, *rev. denied* 278 Kan. 847 (2004), and stated that "an instruction error occurs where, as here, the old pattern reasonable doubt instruction is used." *State v. Ortega*, No. 106,210, 2013 WL 192714, at *6 (Kan. App. 2013) (unpublished opinion). But, the panel noted that Ortega had not objected at trial, and thus the error was reversible only if it was clearly erroneous, which it was not according to the majority. 2013 WL 192714, at *7; see *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012) (to determine reversibility under clear error review, appellate court makes de novo determination of whether it is firmly convinced that the jury would have reached a different verdict had the instructional error not occurred).

As we consider the Court of Appeals' conclusion that this instruction was not clearly erroneous, we have an unusual situation that causes us to circle back to the merits of Ortega's argument. After the panel's decision in this case, this court has repeatedly accepted a trial court's giving of the prior version of the pattern reasonable doubt instruction as *legally* appropriate even if it was not a preferable rendition of the State's burden of proof. *Miller v. State*, 298 Kan. 921, 939, 318 P.3d 155 (2014); see PIK Crim. 3d 52.02 (1995 Supp.); see, *e.g.*, *State v. Smyser*, 297 Kan. 199, 206, 299 P.3d 309 (2013) ("We hold the [older PIK] reasonable doubt jury instruction was legally appropriate and not error."); *State v. Waggoner*, 297 Kan. 94, 99, 298 P.3d 333 (2013) ("[W]e conclude the [older] reasonable doubt instruction in this case was not erroneous."); *State v. Herbel*, 296 Kan. 1101, 1124, 299 P.3d 292 (2013) ("While the older PIK instruction . . . was not the preferred instruction, it was legally appropriate.").

Although the question of whether there was error is not before us, we cannot ignore these recent cases in determining if the giving of the older PIK instruction requires reversal as clear error. Because the instruction is legally appropriate, we cannot say we are firmly convinced that the jury would have reached a different verdict had the jury received the current PIK instruction. See *Williams*, 295 Kan. at 510 (discussing clearly erroneous standard).

ERRORS RELATING TO ORTEGA'S DEFENSE OF MISTAKE OF FACT

The remainder of Ortega's arguments relate solely to her conviction for attempted aggravated interference with parental custody. Two of these issues relate to Ortega's defense of ignorance or mistake, which was based on K.S.A. 21-3203(1). K.S.A. 21-3203(1) states, in part: "A person's ignorance or mistake as to a matter of either fact or law . . . is a defense if it negatives the existence of the mental state which the statute prescribes with respect to an element of the crime." See *State v. LaMae*, 268 Kan. 544, 556, 998 P.2d 106 (2000). Ortega largely focuses on the cumulative effect of these errors. These two errors are so intertwined that we will discuss them together and consider their cumulative

impact. To understand whether these errors were prejudicial, we must first consider their nature and the Court of Appeals' rationale.

At trial, Ortega's defense was that she had not been notified of the CINC hearing, had not received any paperwork regarding V.O.'s custodial status, and had no idea what "SRS custody" meant. Specifically, she emphasized that she did not know that she could not have contact with V.O. or take her out of school. Therefore, she asserts that she could not have formed the specific intent to interfere with SRS's custody of her daughter.

On appeal, Ortega argues two trial errors interfered with her presentation of this defense to the jury: (1) the prosecutor misstated the law regarding this defense, and (2) the trial court failed to instruct the jury on the correct law. The Court of Appeals unanimously found error in both respects, i.e., the prosecutor misstated the law in closing arguments and the trial court should have but did not instruct the jury on the law.

The Court of Appeals panel explained Ortega's prosecutorial misconduct claim and gave the following rationale:

"By saying, '[Ortega's] mother said to her, . . . "[Y]ou can go ahead and take the kids." That's not a defense,' the prosecutor correctly explained that Ortega could not assert the mistake-of-law defense, i.e., she did not know a child in SRS custody could not be taken. See K.S.A. 21-3203(2) ('A person's reasonable belief that his conduct does not constitute a crime' is only a defense in enumerated circumstances.).

"Conversely, by saying, '[W]hether or not [Ortega] got notice about that custody hearing is irrelevant,' the prosecutor incorrectly suggested that Ortega could not assert the mistake-of-fact defense, i.e., she did not know V.O. was in SRS custody. See K.S.A. 21-3203(1) ('A person's ignorance or mistake as to a matter of either fact or law . . . is a defense if it negatives the existence of the mental state which the statute prescribes with respect to an element of the crime.'). That suggestion constituted misconduct because it misstated the law." State v. Ortega, No. 106,210, 2013 WL 192714, at *9 (Kan. App. 2013) (unpublished opinion).

Although the panel found misconduct, a majority concluded it was not so prejudicial as to deny Ortega a fair trial. Ortega, 2013 WL 192714, at *9. Chief Judge Malone disagreed. 2013 WL 192714, at *14 (Malone, C.J., dissenting).

With regard to the trial court's failure to instruct on the defense of ignorance or mistake, the Court of Appeals panel unanimously

held that even though Ortega had not requested an instruction, an error occurred because Ortega's version of events established that she was ignorant of the fact that V.O. was in SRS custody and her ignorance "negated the specific intent necessary to commit attempted aggravated interference with parental custody." 2013 WL 192714, at *5. However, a majority of the panel determined that the error was not clearly erroneous. 2013 WL 192714, at *6. Again, Chief Judge Malone disagreed. 2013 WL 192714, at *14 (Malone, C.J., dissenting).

*Prosecutorial Misconduct Regarding Defense of Ignorance or Mistake*

Accepting the panel's finding of misconduct, we consider whether Ortega was denied a fair trial. This involves a three-factor inquiry: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No one factor is controlling. *State v. Crawford*, 300 Kan. 740, 745, 334 P.3d 311 (2014); *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013); *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004). Before the third factor can ever override the first two factors, an appellate court must be able to say that the State can meet both the statutory harmlessness standard stated in K.S.A. 60-261 and the constitutional standard stated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Crawford*, 300 Kan. at 745-46, *Bridges*, 297 Kan. at 1012-13 (citing *Tosh*, 278 Kan. at 97).

We have observed that, as a practical matter, the result of the harmless error evaluation depends on the outcome of the *Chapman* constitutional standard. "[B]oth the constitutional and non-constitutional error clearly arise from the very same acts and omissions," and the constitutional standard is more rigorous. *Bridges*, 297 Kan. at 1015 (citing *Herbel*, 296 Kan. at 1111). Thus, the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard.

Applying the three factors, the Court of Appeals majority first determined the prosecutor's misstatements were not gross and flagrant. We disagree because most of the factors for determining if a prosecutor's misconduct is gross and flagrant are implicated. As explained in *State v. Marshall*, 294 Kan. 850, Syl. ¶ 6, 281 P.3d 1112 (2012), these factors include whether there are repeated comments emphasizing an improper point, planned or calculated statements, violations of a well-established rule, and violations of a rule designed to protect a constitutional right. Here, the prosecutor told the jury not once, but twice to disregard a fact that it should have considered in determining guilt, *i.e.*, a fact impacting the determination of whether Ortega had the requisite intent. In addition, the comments misstated the law relating to a defense that is defined by statute and, therefore, is well established. And the effect was to impede Ortega's constitutional right to present her defense because the evidence that Ortega did not receive notice of the custody hearing went directly to her defense that she did not know SRS had custody of V.O.

Regarding the second factor of ill will, a prosecutor's ill will is often " 'reflected through deliberate and repeated misconduct.' [Citations omitted.]" *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011). As we have noted, the prosecutor twice misstated the law on ignorance or mistake. Additionally, the prosecutor emphasized that if the jury remembered anything they should remember that the lack of notice of the CINC hearing could not be considered in determining whether Ortega was guilty. Encouraging the jury to remember an improper statement of law suggests deliberate misconduct aimed at undermining the defense. Thus, there was evidence of ill will.

Finally, in considering the prejudicial impact of the statements, the misstatements of law went to the heart of Ortega's defense. Not only did Ortega testify to the lack of knowledge, there was no evidence proving she had received official notice or any evidence that she had a reason to doubt her mother's representation that she could get her child.

Ortega argues the prosecutor's misstatements of law alone are sufficient to require us to reverse her conviction for attempted

aggravated interference with parental custody. But she also asserts that the panel failed to accumulate this harm and the harm caused by the trial court's failure to instruct the jury on the law regarding the defense of ignorance or mistake, and she urges us to do so. Specifically, Ortega contends that the only way to have mitigated the prosecutor's misstatements of law would have been to give a jury instruction on the law. See *State v. Qualls*, 297 Kan. 61, 71, 298 P.3d 311 (2013) (defendant "entitled to instructions on the law applicable to his defense theory if there was evidence to support that theory, as long as the evidence when viewed in the light most favorable to him was sufficient to justify a rational factfinder finding in accordance with that theory"). But the trial court failed to do so.

Hence, we will consider the lack of an instruction before continuing our evaluation of the prejudice, if any, caused by the prosecutor's statements.

*Instructional Error*

The Court of Appeals held that the trial court should have instructed the jury on the law regarding the defense of ignorance or mistake but determined the error was not reversible under a clear error standard. *Ortega*, 2013 WL 192714, at *4; see *Williams*, 295 Kan. at 526 (to determine reversibility under clear error review, appellate court makes de novo determination of whether it is firmly convinced that the jury would have reached a different verdict had the instructional error not occurred). In ruling that the failure to give the instruction was not clear error, the Court of Appeals relied on *State v. Diaz*, 44 Kan. App. 2d 870, 873, 241 P.3d 1018 (2010), *rev. denied* 291 Kan. 914 (2011).

In *Diaz*, another panel of the Court of Appeals stated: "Although termed a 'defense,' the mistake-of-fact doctrine merely encapsulates the State's burden to prove every element of the offense: the State cannot convict the defendant if it fails to show that the defendant had the required mental state when committing the crime." 44 Kan. App. 2d at 873. Here, the panel reasoned that Ortega was allowed to present evidence that Ortega lacked the intent to detain or conceal V.O. The panel observed that, in fact,

the defense had presented evidence that Ortega did not know the meaning of "SRS custody" or that V.O. was in SRS's custody. "But the jury evidently believed the sea of contrary evidence presented by the State." *Ortega*, 2013 WL 192714, at *5.

In reaching this conclusion, the panel did not note a significant difference between this case and *Diaz*. In *Diaz*, the defendant was convicted of failure to appear after he did not attend the pretrial conference in his felony case and did not turn himself in for over 8 months. Diaz argued that his failure to appear was not willful and that a mistake instruction should have been given. The Court of Appeals determined that Diaz' claimed mistake did not negate the required mental state for aggravated failure to appear because it was a general intent crime; he needed only to intend to "not appear" and "not turn himself in." 44 Kan. App. 2d at 875. Thus, an instruction on mistake would not have been legally appropriate. In this case, interference with parental custody is a specific intent crime and Ortega's claimed mistake could have negated the required mental state. See *State v. Brown*, 291 Kan. 646, 654-55, 244 P.3d 267 (2011) (holding attempt is a specific intent crime); *State v. Wiggett*, 273 Kan. 438, 444, 44 P.3d 381 (2002) (describing interference with parental custody as removal of the child "with the specific intent to detain or conceal the child" from his or her parent or lawful custodian).

Significantly, nothing in the trial informed the jury that Ortega's mistaken belief could be a valid defense. Contrary to the panel's conclusions and State's arguments, the elements instruction for attempted aggravated interference with parental custody did not provide this information—it simply instructed that intent was an element. Further, defense counsel's ability to present evidence and argue regarding the defense provided only part of what the jury needed. Without an instruction, the jury had no directions from the court about how to consider the information. Consequently, the only direction the jury received was misdirection in the form of the prosecutor's statement that the lack of notice was irrelevant and did not matter.

Thus, it cannot be said that the jury applied the correct legal standard in assessing Ortega's intent to commit the crime. See

*State v. Cummings*, 297 Kan. 716, 732, 305 P.3d 556 (2013) (finding that the State's manipulation of an instruction's "reasonable probability" language to its advantage in closing argument firmly convinced the court that the jury applied the incorrect legal standard to assess criminal culpability); *State v. King*, 297 Kan. 955, 983-84, 305 P.3d 641 (2013) (concluding that the failure to give a unanimity instruction was clearly erroneous because review of the record led to the conclusion that the inconsistencies in the evidence could have led to the jury's disagreement and confusion regarding responsibility).

In other words, the harm of the instructional error is compounded by the prosecutor's misconduct. A proper jury instruction might have mitigated the prosecutor's misstatement of law. On the other hand, the failure to give an instruction increased the likelihood that the statements of the prosecutor—standing uncorrected by the trial court—affected the verdict.

As we assess the reversibility standards for prosecutorial misconduct and instructional error under a clearly erroneous standard, the State has the more difficult burden on the prosecutorial misconduct claim—it must establish beyond a reasonable doubt that the misconduct did not affect the outcome of the trial in light of the entire record. We conclude it cannot meet this burden, especially when the misconduct was not corrected by an instruction from the trial court. Hence, we reverse Ortega's conviction for attempted aggravated interference with parental custody.

## Lesser Included Offense Error

Ortega also asserts the trial court committed clear error by failing to instruct the jury on the lesser included offense of attempted interference with parental custody.

Addressing whether the lesser included offense instruction should have been given, the Court of Appeals panel unanimously held that an "instruction error did occur because there was conflicting evidence regarding where Ortega intended to take V.O." *Ortega*, 2013 WL 192714, at *5. The panel split in its determination of whether the error was clearly erroneous. A majority concluded it was not. 2013 WL 192714, at *6-7. In the dissent, Chief Judge

Malone indicated he was firmly convinced there was a real possibility the jury could have found Ortega guilty of the lesser offense because whether she was going to leave the state was a substantial fact dispute. 2013 WL 192714, at *13 (Malone, C.J. dissenting).

On petition for review, the only issue before us is whether the reversibility decision was correct. Our decision to reverse Ortega's conviction for attempted aggravated interference with parental custody means we need not consider that question. Thus, on remand, the trial court and parties should take heed of the Court of Appeals' holding, assuming the evidence again supports the giving of the lesser included offense instruction.

## OTHER CLAIM OF PROSECUTORIAL MISCONDUCT

The final error we have yet to address is another claim of prosecutorial misconduct. In this issue, Ortega focuses on a portion of the State's opening argument in which the prosecutor told the jury that there was another uncharged act by Ortega involving one of her other children. The Court of Appeals held that the prosecutor violated the motion in limine, but the violation did not deprive Ortega of a fair trial. *Ortega*, 2013 WL 192714, at *8. Once again, the only issue before us is whether the Court of Appeals erred in holding the error did not require us to reverse Ortega's conviction for attempted aggravated interference with parental custody. And again, we need not address this issue because we are reversing the conviction on other grounds.

## CUMULATIVE ERROR

In her final issue, Ortega argues the cumulative impact of the trial errors resulted in an unfair trial and her convictions must be reversed. We have already determined that cumulative error requires reversing Ortega's conviction for attempted aggravated interference with parental custody. The remaining question is whether cumulative error requires us to reverse Ortega's conviction for disorderly conduct as well. But the errors we have found impact only the attempted aggravated interference with parental custody conviction. We have determined that there was no merit to any of the issues that might impact the entire trial, and no issue

was specific to Ortega's conviction for disorderly conduct. Therefore, the cumulative error doctrine does not apply to our consideration of Ortega's disorderly conduct conviction. See *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009) (cumulative error doctrine does not apply if no error or only one error supports reversal).

Hence, while we reverse Ortega's conviction for attempted aggravated interference with parental custody, we affirm her conviction for disorderly conduct.

Judgment of the Court of Appeals affirming the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed in part, reversed in part, and remanded.

MORITZ, J., not participating.

GERALD T. ELLIOTT, District Judge Retired, assigned.