NOT DESIGNATED FOR PUBLICATION

No. 126,115

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GAVIN EDWARD ALLEN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Barton District Court; CAREY L. HIPP, judge. Submitted without oral argument. Opinion filed September 6, 2024. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ISHERWOOD, P.J., WARNER and COBLE, JJ.

PER CURIAM: Following a jury trial, Gavin Edward Allen was convicted of felony driving under the influence of alcohol (DUI). Allen appeals, arguing the State committed reversible prosecutorial error during closing argument when the prosecutor asked the jury not to discredit the testimony of the arresting officers because they failed to activate their body cameras. Allen argues the prosecutor effectively told the jury to ignore certain evidence, but the record shows that the prosecutor was merely explaining to the jury what it should consider when assessing the officers' credibility. Because the prosecutor's

comment did not exceed the wide latitude the State is afforded in conducting its case, we find no error and affirm Allen's conviction.

FACTUAL AND PROCEDURAL BACKGROUND

In the late afternoon of September 17, 2020, a resident of Great Bend received a call from his wife telling him that a man was sitting in a vehicle across the street from their home and had flipped her off as she pulled into their driveway. The resident came home from work to investigate and noticed that the doors of the man's vehicle were open and that the man was laying down in the back seat, apparently unconscious; he recalled that the vehicle was littered with trash and had a big clump of grass in its front bumper. Suspicion aroused; the resident decided to call the police.

When Officer Paul Leiker and Corporal Paul Lovett of the Great Bend Police Department arrived, they quickly spotted the vehicle reported by the resident, a Chevy Tahoe, parked partially on the sidewalk. As the officers approached, they saw a can of Four Loko, an alcoholic beverage, under the front of the Tahoe and another empty can on the passenger-side floorboard of the Tahoe. Officer Leiker further saw a pool of liquid on the venter console and a vomit smell emanating from within the Tahoe. The officers also noticed the clump of tall grass in the front bumper and on the antenna, as if the Tahoe had recently been driven through a field.

As Officer Leiker and Corporal Lovett looked inside the Tahoe, they saw a man, later identified as Allen, stretched out in the backseat, covered in vomit. Concerned for the man's well-being, Corporal Lovett attempted to rouse him and asked if he was okay, but Allen continued to drift in and out of consciousness. Corporal Lovett noticed that Allen had bloodshot eyes, smelled of alcohol, and appeared very groggy. In response to the officer's questions, Allen claimed that he had not been driving the Tahoe and stated

2

that a woman, whose name he did not know, had been driving. But Corporal Lovett did not see anyone else in or around the Tahoe.

At this point, Corporal Lovett went to speak with the reporting party, who told the officer that he had a motion-activated home surveillance system with a view of the street in front of his house. The resident showed him the security footage and later emailed it to the officers. According to Corporal Lovett, the surveillance footage showed the Tahoe making an unusually wide turn and parking in front of the reporting party's home at 2:11 p.m. Shortly thereafter, a man resembling Allen—and wearing the same clothing as Allen was wearing when found asleep—stepped out of the driver's seat. The videos also showed a woman in the front passenger seat but never behind the wheel of the Tahoe. Corporal Lovett returned outside to speak with Allen, as he later testified:

> "At that point I wanted him to exit the vehicle, because I had seen the video where he had been driving it, so I knew there wasn't a female driving it. Because of the vomit I'd observed, because of the way his speech was slurred, I believed that he had possibly been under the influence or was under the influence while he had been driving. So I wanted him to get out of the vehicle."

When asked to get out of the Tahoe, Allen became confrontational with Corporal Lovett, repeatedly denying that he had been driving and refusing to get out. When Allen finally did get out, he had trouble standing and his pants repeatedly fell down.

The officers decided not to ask Allen to attempt any field sobriety tests because they did not believe he would be able to safely complete them—Corporal Lovett later recalled that Allen's uncooperative behavior, his inability to maintain his balance, the strong smell of alcohol on him, and the visible vomit on his clothes were clear indicators of Allen's intoxication. Corporal Lovett then arrested Allen, and, because of the vomit, decided that a blood sample would be the most accurate test of possible intoxication. After obtaining a search warrant, a nurse took a blood sample, which upon analysis

revealed that Allen had a blood alcohol concentration of .162—roughly twice the legal limit.

The State charged Allen with felony DUI, due to Allen's two prior DUI convictions in 2012 and 2019, and misdemeanor transportation of liquor in an opened container.

The case proceeded to trial where the reporting resident, Officer Leiker, Corporal Lovett, and the individuals who took and analyzed Allen's blood sample each testified. Additionally, the State presented the home surveillance footage showing the vehicle parking in front of the house before Allen got out and laid down in the backseat of the Tahoe. At trial, it emerged that neither Officer Leiker nor Corporal Lovett had activated their body cameras during their encounter with Allen. Officer Leiker conceded that he did not use his body camera because he attempted to activate it, but its battery was "dead." Corporal Lovett similarly testified that his body camera was inoperable. The officers also conceded that they never personally saw Allen driving or attempting to drive the Tahoe, although Corporal Lovett noted the security footage showed what appeared to be Allen driving erratically and parking in front of the reporting party's house. Allen's primary defense during his closing argument was that the officers did not have any direct evidence that he had driven the Tahoe and that the officers' failure to use their body cameras was suspicious.

After considering the evidence, the jury found Allen guilty of DUI but acquitted him of the transportation of an alcoholic beverage in opened container charge. The district court sentenced Allen to a 1-year jail sentence but suspended that sentence, ordering him to serve a year of post-imprisonment supervision with Community Corrections after spending 90 days in jail.

Allen timely appeals his conviction.

In his sole argument on appeal, Allen contends the prosecutor committed reversible prosecutorial error during closing argument by encouraging the jury to ignore any evidence that the arresting officers failed to turn on their body cameras during his arrest. The State contends no error occurred, maintaining the prosecutor did not invite the jury to ignore any evidence but instead asked the jury to view all the relevant circumstances—and not hold the lack of body camera footage against the officers—during their deliberations.

Prosecutors are given wide latitude in crafting their closing arguments to address any weaknesses of the defense and to otherwise "'conduct the State's case in a manner that does not offend the defendant's constitutional right to a fair trial.'" *State v. Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024). Appellate courts utilize a two-step framework when analyzing claims of prosecutorial error: First, we must determine whether the prosecutor committed an error. Prosecutors err when they do things such as "misstate the law applicable to the evidence, comment on witness credibility, or shift the burden of proof to the defendant." 318 Kan. at 302. When determining whether a prosecutor's statement falls outside acceptable bounds of argument, we must not analyze the statement in isolation but consider the context in which the statement was made. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). This is because "the line between permissible and impermissible argument is context dependent." *State v. Martinez*, 311 Kan. 919, 923, 468 P.3d 319 (2020).

If an error occurred, we proceed to determine whether the error prejudiced the defendant's due process rights to a fair trial under the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). See, e.g., *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Under that test, "prosecutorial error is harmless if the State can demonstrate

'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

Allen argues the prosecutor erred by encouraging "the jury to disregard instructions given by the court." Specifically, he claims the prosecutor told the jury to ignore certain evidence and to disregard the officers' failure to utilize their body cameras during their encounter. Allen points to the following portion of the prosecutor's argument, to which his trial counsel did not object:

> "Now, in a few minutes [Allen's counsel] is going to stand up here and talk about a number of things. One thing I expect that he'll talk to you about that I want to just touch on is body cameras. As both officers said, for various technical reasons their body cameras were not functioning that day; one due to a dead battery, the other to a defective camera that he'd had repeated trouble with.
> "*I ask you, don't hold it against the officers that their cameras simply weren't working that day. That's not something they had control of.* That's just a situation that they were put in, that they had to deal with and still do their jobs. *So I ask that you go back to the jury room, you keep that in mind when you're looking at all this evidence.*" (Emphases added.)

We find Allen's contention that the prosecutor's statement was akin to telling the jury to neglect certain pieces of evidence during their deliberations to be misguided.

Contrary to Allen's classification of the prosecutor's argument, when viewing the comment in the context of the entire record, it is evident the prosecutor was addressing the weight the jury should give to the totality of evidence before it. In essence, the prosecutor was arguing that despite the officers' failure to use their body cameras, their testimony regarding their encounter with Allen could still be found to be credible—that is, the jury should look at all the evidence together and not weigh against the officers the

6

fact that they failed to use their cameras, for whatever reason. While it is improper for prosecutors to offer personal opinions regarding the credibility of a witness or accuse a witness of lying, they are permitted to make arguments explaining to the jury what to look at when assessing that credibility. *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014).

Here, the prosecutor did not give unsworn testimony attempting to bolster the officers' truthfulness. Rather, the prosecutor asked the jury to consider the officers' explanations about why they could not use their body cameras when considering Allen's expected defense: that their failure to record the interaction was somehow nefarious or was otherwise evidence of the officers' lack of trustworthiness. In response to Allen's anticipated attack on the officers' credibility, the prosecutor attempted to explain to the jury what it should consider when assessing the officers' testimony and their credibility, which is not outside the wide latitude afforded the State. See *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010); *State v. McReynolds*, 288 Kan. 318, 325-26, 202 P.3d 658 (2009). As such, we do not find the prosecutor's comment that the jury should not hold the officers' failure to use their body camera against them to constitute prosecutorial error.

Allen peripherally points to two authorities to support his argument that the prosecutor misstated the law and encouraged the jury to ignore the district court's jury instructions, but neither is persuasive. In both *State v. Brown*, 59 Kan. App. 2d 418, 449-51, 486 P.3d 624 (2021) and *State v. McCorkendale*, 267 Kan. 263, 282, 979 P.2d 1239 (1999), *disapproved of on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009), the prosecutors committed error by telling the jury to skip over certain lesser included offense instructions because they believed that the State had met its burden to prove the greater offenses. Together these cases underscore an obvious point:  A prosecutor's argument that the jury should simply ignore instructions given by the court is patently unreasonable and constitutes prosecutorial error. But both cases are easily

distinguishable as the prosecutor in this case did not tell the jury to ignore any jury instructions. And, as noted above, the prosecutor did not encourage the jury to disregard any evidence, but instead offered a suggestion on the weight of the evidence.

During his closing argument, the prosecutor acknowledged the lack of body camera footage but asked the jury to consider all the circumstances when considering the officers' reasons for not activating their body cameras. Rather than encouraging the jury to disregard evidence, the prosecutor was asking the jury to consider all of the evidence before it—both the lack of body camera footage and the reason for the lack of footage—when deliberating. Moreover, the prosecutor's comment aligned with the district court's instruction that the jury was required to view all the evidence presented—not that it should ignore or disregard any particular piece of testimony regarding the lack of body camera footage. In short, the prosecutor asked the jury to consider Officer Leiker's and Corporal Lovett's explanations regarding their body camera footage when considering the evidence and assessing their credibility. Accordingly, we conclude that the prosecutor's statements were within the wide latitude allowed the State when discussing evidence.

Because we find the prosecutor committed no error, it is unnecessary for us to determine whether any error affected the outcome of the trial.

Affirmed.