NOT DESIGNATED FOR PUBLICATION

No. 126,492

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAVID LEROY MARKS JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; JESSICA HEINEN, judge. Submitted without oral argument. Opinion filed October 24, 2025. Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Carolyn A. Smith*, assistant deputy district attorney, *Mike Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., MALONE and CLINE, JJ.

PER CURIAM: David Leroy Marks Jr. appeals his convictions of aggravated indecent liberties with a child and aggravated criminal sodomy. Marks' first trial resulted in a mistrial because of a deadlocked jury, but he was found guilty as charged in his second trial. Marks raises nine issues on appeal, some of which are not properly preserved for appellate review. Marks claims: (1) Insufficient evidence of attempted aggravated criminal sodomy at his first trial prevented his retrial on the completed crime; (2) the district court erred by declaring a mistrial because of a deadlocked jury without conducting an adequate inquiry; (3) the district court erred in allowing the State to amend

1

dates of charges in the complaint after the first trial; (4) the Kansas Constitution provides greater double jeopardy protections than the federal Constitution, prohibiting retrial here; (5) the charges against Marks were not brought within the statute of limitations; (6) the district court erred in allowing propensity evidence; (7) the State committed reversible prosecutorial error during closing argument; (8) there was a multiple acts violation based on no election by the State and no unanimity instruction; and (9) he was denied a fair trial based on cumulative error. After thoroughly reviewing the record and for reasons explained below, we find no reversible error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

After G.J., born in 2008, confided to some of her friends that her step-grandfather, Marks, had sexually abused her, they told her that she should tell her mother. In April 2020, Marks and Grandmother, who then lived in Colorado, were planning to visit Mother and G.J. in Topeka for G.J.'s birthday, but G.J. refused to see them. When her Mother demanded an explanation, G.J. finally told her about what Marks had done. Mother contacted the Shawnee County Sheriff's Department about G.J.'s allegations, and an officer responded and spoke with Mother. Following Mother's report, the officer scheduled a forensic interview with G.J. at LifeHouse Advocacy Center (LifeHouse).

During the forensic interview, G.J. spoke with Jill Shehi-Chapman, a program director at LifeHouse. G.J. told Shehi-Chapman that she thought Marks had begun abusing her when she was three years old, explaining that he would bribe her into cooperation, put her onto a bed, pull down her pants, and lick her genitals. While G.J. struggled to recall certain details, she remembered an instance of abuse that occurred around Christmas one year because she had accidentally told Mother about a surprise present for Mother—an Oakland Raiders jacket. She believed that this incident occurred when she was three years old. G.J. also stated that Marks' last assault had occurred the prior summer when she was visiting him in Colorado. She could not recall any details of

2

that incident beyond the fact that it was painful. G.J. also recounted that Marks told her that if she told anyone about what he had done, he would hurt her. G.J. returned for a second interview at LifeHouse a few days later.

A few weeks after G.J.'s interviews, two detectives from the Shawnee County Sheriff's Office traveled to Colorado to interview Marks. Marks repeatedly denied touching G.J.; he accused G.J. of making up the allegations, stated that she had falsely reported similar accusations against her father, and stated that she watched pornography. Marks also stated that if he had touched G.J., she "would have came forward before now."

On September 25, 2020, the State charged Marks with aggravated criminal sodomy, which it alleged occurred sometime in December 2015. Three months later, following a preliminary hearing, the State filed an amended complaint, adding an additional count of aggravated indecent liberties with a child and changing the date of the offenses to between December 1, 2014 and December 31, 2014.

Before trial, the State moved for the admission of evidence relating to Marks' three prior convictions for aggravated indecent liberties, which had occurred in 2002 and were perpetrated on family members under similar circumstances as those alleged by G.J. Marks contested the State's motion, arguing the evidence would be unduly prejudicial. He also moved for the admission of evidence relating to G.J.'s prior allegations of sexual abuse against her father, which she had later recanted after an investigation by the Kansas Department for Children and Families. The district court granted the State's motion to admit propensity evidence under K.S.A. 60-455(d), ruling that the State could introduce testimony from Marks' prior victims, the complaint, and the journal entry of judgment from those cases. The district court also granted Marks' motion to admit evidence of G.J.'s prior false accusations if she denied making them while testifying.

3

*The first jury trial*

The case proceeded to a jury trial in March 2022. This first trial lasted four days, and we will not summarize all the evidence. G.J. testified and the State played her forensic interviews for the jury. G.J. recalled that Marks first sexually abused her at his house in Topeka around Christmas time. She explained that she remembered that occasion because she had spoiled her mother's surprise present of a Raiders jacket that year. G.J. testified that she believed she was three years old at that time, but Mother testified that G.J. would have been six years old the year Mother received Raiders gear for Christmas. Mother confirmed this timeline based on pictures of her wearing the Raiders jacket just after Christmas in 2014.

At the close of the evidence, the district court instructed the jury on the charge of aggravated criminal sodomy with the lesser offense of attempted aggravated criminal sodomy and also on the charge of aggravated indecent liberties with a child. In closing arguments, Marks' counsel highlighted the inconsistencies in G.J. and Mother's testimony about when the incident occurred and argued that the State was required to prove that the crimes had happened in December 2014, as alleged in the charging document.

After a little more than a day of deliberation, the jury told the bailiff that it failed to reach a verdict on either count. The district judge called the jury into the courtroom and asked the presiding juror one question: "It's my understanding . . . that jurors are not able to reach a verdict on either one of the counts; is that correct?" The presiding juror agreed, and, without any further inquiry, the district court declared a mistrial because of the deadlocked jury. Marks did not object or consent to the mistrial.

Following the mistrial, the State moved to amend its complaint to extend the dates of the offenses from December 2014 to "a date range of April 24, 2011 to December 31, 2014." The State argued that the expanded timeframe represented G.J.'s recollections

4

during the forensic interviews and testimony from the preliminary hearing and trial—the 2011 start date reflected G.J.'s third birthday. Marks opposed the amendment, claiming the broader range of dates would make it more difficult to present a defense. But the district court permitted the amendment, finding the expanded date range was not misleading or overbroad and was not a surprise to Marks.

*The second jury trial*

The second jury trial began on February 27, 2023. The State presented mostly the same witnesses from the first trial:  G.J., Mother, the forensic interviewer from LifeHouse, the investigating police officers, and Marks' prior victims. G.J. testified that Marks had sexually assaulted her more than 30 times starting when she was three years old. Although she stated that her memories of the various assaults were a blur, she recalled with detail the incident that occurred in Marks and Grandmother's house in Topeka around Christmas time the year that her mother received the Raiders jacket. She testified that on that occasion, Marks "brought [her] up to his room, pushed [her] on the bed, pulled down [her] pants, and began to lick [her] vagina." G.J. recalled that Marks had committed similar acts "[s]even or eight" times at that house in Topeka, and she described a pattern of behavior from Marks, which included him forcing her to watch pornography, touching her genitals, and trying to insert his penis inside her. G.J. thought she was maybe three or four years old when these events occurred. She added that the abuse continued after Marks moved out of Topeka, and that he had abused her the previous summer when she was visiting him and Grandmother in Colorado.

Mother testified that G.J.'s recollection of the Christmas time incident must have occurred in 2014, when G.J. was six years old, because that was the year she had received the Raiders jacket. Mother confirmed that she and G.J. had spent Christmas with Marks and Grandmother that year, and that she had pictures of her wearing the Raiders jacket.

5

Marks did not testify at trial, but he presented a general denial defense. The district court instructed the jury on the charges of aggravated criminal sodomy and aggravated indecent liberties with a child. During closing arguments, Marks' counsel emphasized the fact that G.J. was unsure if the Christmas time incident occurred in 2011 when she was three or 2014 when she was six. The jury found Marks guilty of both charges.

Before sentencing, Marks moved for a downward departure, which the State opposed. After finding Marks' criminal history score to be A, the district court denied the departure motion and sentenced Marks to concurrent terms of life imprisonment without the possibility of parole. Marks timely appealed the district court's judgment.

ANALYSIS

*Did insufficient evidence of attempted aggravated criminal sodomy at Marks' first trial prevent his retrial on the completed crime?*

Marks' first claim on appeal is an atypical one and it only affects his conviction of aggravated criminal sodomy. In Marks' first trial, the district court instructed the jury on both aggravated criminal sodomy and attempted aggravated criminal sodomy as a lesser included offense. The jury deadlocked on both the charged and lesser included crimes. Marks argues that the jury should have acquitted him of the attempted crime because there was no evidence that he attempted but failed to complete the crime. He argues the jury was required to acquit him of attempted aggravated criminal sodomy due to insufficient evidence as a matter of law. Marks asks this court to make that determination now. He then argues that under these facts, K.S.A. 21-5110(a)(1) bars retrial of the aggravated criminal sodomy count because the former prosecution "[r]esulted . . . in a determination that the evidence was insufficient to warrant a conviction."

Marks acknowledges that he is raising this issue for the first time on appeal. But he argues that this is a sufficiency of the evidence claim that can be raised on appeal

6

without any objection below. Alternatively, Marks argues that he can raise the issue for the first time on appeal under the standard preservation exceptions that (1) the newly asserted theory involves only a question of law arising on admitted facts and is finally determinative of the case and (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). The State forcefully argues that the issue is not preserved and that we should not address Marks' new claim for the first time on appeal.

We reject Marks' argument that this is a sufficiency of the evidence claim that can be raised for the first time on appeal. Marks is asserting a statutory double jeopardy claim under K.S.A. 21-5110(a)(1), not a sufficiency of the evidence claim. We also question whether the first preservation exception applies because Marks is asking us to review disputed facts to find there was insufficient evidence at the first trial to support the lesser included charge of attempted aggravated criminal sodomy. But an appellate court's decision to review an unpreserved claim under an exception is prudential; even if an exception applies, the appellate court is not obligated to review the claim. *State v. Rhoiney*, 314 Kan. 497, 500, 501 P.3d 368 (2021). We decline to address Marks' unpreserved claim for the first time on appeal.

*Did the district court err by declaring a mistrial because of a deadlocked jury without conducting an adequate inquiry?*

Marks next claims the district court erred in declaring a mistrial because of a deadlocked jury without conducting an adequate inquiry. He asserts the district court erred when it declared a mistrial without first asking the jury if further deliberations could help them reach a verdict. He contends that the lack of inquiry by the district court renders the record insufficient to establish that the declaration of a mistrial was a manifest necessity, and therefore the second trial violated his protections against double jeopardy.

7

The State first asserts this claim is unpreserved and we should not address it for the first time on appeal. On the merits, the State maintains that the district court's decision to declare a mistrial was proper under the circumstances and Marks' retrial on the charges did not violate his double jeopardy protections.

Marks acknowledges that he did not object to the district court's declaration of a mistrial, but he contends this court should nevertheless review his argument because it presents a pure question of law and implicates his fundamental right to a fair trial. See *Allen*, 314 Kan. at 283. We agree that these standard preservation exceptions apply. We observe that the Kansas Supreme Court recently addressed this same issue when the defendant did not object to the granting of a mistrial in district court. *State v. Kornelson*, 311 Kan. 711, 714-21, 466 P.3d 892 (2020). Following this lead, we choose to address Marks' mistrial/double jeopardy claim for the first time on appeal.

The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights prohibit the State from pursuing multiple prosecutions or punishments for the same offense. Generally, there are three broad categories that these guards against double jeopardy protect against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *State v. Schoonover*, 281 Kan. 453, 463, 133 P.3d 48 (2006). "'Whether a particular criminal defendant's protection against double jeopardy was violated is a question of law over which [the court has] unlimited review.'" *Kornelson*, 311 Kan. at 714.

In *Kornelson*, the Kansas Supreme Court held that "when a trial court sua sponte declares a jury deadlocked and orders a mistrial when the defendant does not object or consent to the mistrial, retrial should be permitted only when there was a manifest necessity for the court's action." 311 Kan. at 718. In explaining the manifest necessity standard, the *Kornelson* court highlighted several factors to help clarify when a jury

8

deadlock may justify a mistrial, including: "'the jury's own statements that it cannot agree, the length of deliberations, the length of trial, the complexity of the issues presented, the jury's communications to the judge, and the impact that further, forced deliberations might have on the verdict.'" 311 Kan. at 719.

The facts in *Kornelson* are important. The State charged Kornelson with alternative counts of felony driving under the influence (DUI). In the first trial, the evidence was presented in a single afternoon. Shortly after 4:30 p.m., the district court instructed the jury, the parties presented their arguments, and the jury commenced deliberations. About an hour and 15 minutes later, the jury sent a note to the court, saying "Count 1 Hung" and "Count 2 Hung[.]" 311 Kan. at 712. The district court brought the jury into the courtroom with Kornelson present and confirmed with the jury foreperson that the jury could not reach a unanimous verdict. The district court asked the foreperson whether further deliberations "'might be a fruitful course of action?'" 311 Kan. at 713. The foreperson said they did not know and would need to ask the jurors. The district court then asked the jurors, by a show of hands, whether returning to court the next morning would "create a hardship on any of you." 311 Kan. at 713. One juror responded that it would be a hardship because of a work concern. The district court then stated, "Well, you have certainly given it your all. It's a long day to be here from nine until 6:30. I'm going to declare what we call a hung jury." 311 Kan. at 713.

Neither Kornelson nor the State objected to the mistrial. At the second trial, a new jury found Kornelson guilty of both alternative counts of DUI. The Supreme Court ultimately ruled: "Given these circumstances, coupled with the deference and discretion our caselaw affords the trial judge making these decisions, we hold the record supports the determination that the jury was deadlocked under the manifest necessity standard. The second trial did not violate Kornelson's double jeopardy rights." 311 Kan. at 721.

Returning to our case, rather than arguing that no manifest necessity justified a mistrial, Marks contends the district court's failure to inquire whether additional time could have helped the first jury break the deadlock and reach a verdict was a reversible error. He contends that the district court failed to appropriately exercise any discretion when it made its decision. Marks is correct that it would have been better practice for the district court to ask the first jury if further deliberations could help them reach a verdict. But he cites no authority requiring such a bright line rule. Instead, this court must look to the record to see if it supports the conclusion that the jury was deadlocked under the manifest necessity standard.

At the end of the first trial, following a little over a day of deliberation, the jury told the bailiff that it could not reach a verdict on either count. The district court asked the presiding juror one question: "It's my understanding . . . that jurors are not able to reach a verdict on either one of the counts; is that correct?" The presiding juror agreed, and, without any further inquiry, the district judge declared a mistrial because of the deadlocked jury. Marks did not object or consent to the mistrial.

Even though the manifest necessity standard was never addressed when the district court ordered the mistrial, several factors identified by the *Kornelson* court weigh in favor of such a finding. To begin, the jury communicated to the bailiff that it could not agree on a verdict on either charge against Marks and the district court confirmed that communication on the record.

Next, the jury deliberated for a considerable time relative to the length of the trial. It appears the jury began deliberating at 3:30 p.m. on the third day of trial and then continued its deliberations from 9 a.m. until 4:30 p.m. the following day—so, as noted above, the deliberations lasted a little over one day. The trial itself took place over three days, with the bulk of the evidence being presented on the second day. The issues presented—although involving serious and disturbing charges—were not particularly

complex. The jury was ultimately presented with a choice between two narratives: G.J.'s accusations with the investigating officers' corroboration versus Marks' denial of the accusations. The district court could not ask the jury to disclose its specific vote count. But the trial was largely a credibility contest and boiled down to whether the jurors believed the testimony of the State's witnesses or Marks' denial, which suggests that they were at an impasse that was unlikely to be resolved with more deliberations.

The final *Kornelson* factor is the impact that further, forced deliberations might have on the verdict. 311 Kan. at 719. The *Kornelson* court addressed this tension, noting the existence of dueling concerns and the corresponding importance of granting deference to a district court's judgments in cases with deadlocked juries:

> "'On the one hand, if [the judge] discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments.'" 311 Kan. at 719 (quoting *Arizona v. Washington*, 434 U.S. 497, 509-10, 98 S. Ct. 824, 54 L. Ed. 2d 717 [1978]).

Here, before discharging the jury, the judge explicitly noted the length of the jury's deliberations and the difficult nature of arriving at a verdict: "I know how hard you have worked. You know, you'd been here an hour and a half yesterday, and all day today. And I know you really have worked hard, and I do want to express my appreciation to you." The mere fact that the district court did not ask more questions of the jury does not render

its decision unreasonable, especially considering that such questioning could have pressured the jury into making a rash decision to obtain a unanimous verdict.

After a full day of deliberation, the jury in this case was deadlocked as shown by its statement to the bailiff and the presiding juror's comment to the judge. While the charged offenses were grave, the evidence and legal issues presented were straightforward—the ultimate issue for the jury was whether it believed the witnesses' testimony or Marks' denial of the conduct he was charged with committing. If the record in *Kornelson* supported the determination that the jury was deadlocked under the manifest injustice standard, we can make that same determination here. We conclude that the district court's decision to order a mistrial in Marks' first trial because of a deadlocked jury was based on manifest necessity. As a result, the charges brought in the second trial did not violate Marks' protections against double jeopardy.

*Did the district court err in allowing the State to amend dates of charges in the complaint after the first trial?*

Next Marks claims the district court abused its discretion when it permitted the State to amend the charging document after the first trial to expand the charging dates from one month to over three years. Marks first argues that the State charged additional crimes by broadening the dates because it transformed the single crime originally charged into a multiple acts crime. Second, Marks argues that the post-first-trial amendment prejudiced his substantial rights including his right to present a defense. The State asserts the district court acted within its discretion when it permitted the amendment.

The State may amend a charging document at any time before a verdict is reached so long as the amendment does not charge additional or different crimes and the defendant's substantial rights are not prejudiced. K.S.A. 22-3201(e). When evaluating prejudice, Kansas courts consider "whether (1) the date was a critical issue; (2) the

12

change implicates the statute of limitations; (3) the amendment affects an alibi defense; (4) time was an element of the offense; or (5) there is any surprise to the accused." *State v. White*, 316 Kan. 208, 213-14, 514 P.3d 368 (2022). An appellate court reviews a district court's decision to grant a motion to amend a charging document for an abuse of discretion, which will be found only if the court's decision was based on an error of fact or law, or if it was arbitrary, fanciful, or unreasonable. 316 Kan. at 213. The party asserting the district court abused its discretion has the burden of showing it. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

Marks' first argument is misguided. Allowing the State to amend the dates of the charges after the first trial did not result in additional or different crimes being charged. Marks was charged with one count of aggravated criminal sodomy and one count of aggravated indecent liberties with a child before the amendment, and he remained charged with the same crimes after the amendment. While expanding the dates that the charges were committed may have contributed to a multiple acts violation, any error in that regard will be addressed separately later in this opinion.

Marks primarily contends that the State's amendment after the initial mistrial prejudiced him because it removed his chosen defense that the alleged offenses did not occur in December 2014 as alleged in the State's original complaint. At the hearing on the State's motion to amend, the State explained that the impetus for its amendment was the "discrepancy between [G.J.'s] testimony saying she was three when it happened, and then mom saying, no, it was actually 2014 when it happened." Marks argued that the amendment made the charges overly broad. The district court found that the State's proposed amendment did not constitute a surprise because it conformed to the evidence presented at the preliminary hearing and at the first trial.

On appeal, Marks argues that the date of the offenses was a critical issue because his original defense was that G.J.'s inconsistent testimony about when his abuses

13

occurred did not establish that the crimes happened in December 2014. Importantly, Marks' defense was not an alibi based on that original time frame but a general denial of the accusations and a highlighting of the inconsistencies of G.J.'s testimony. He makes no allegation that the amendment caused any unfair surprise.

Kansas courts typically give the State "'considerable latitude in charging the time periods during which child victims have been sexually abused.'" *White*, 316 Kan. at 214. Because such charges often depend on the memories and testimony of children, the Kansas Supreme Court has explained that "[t]ime is not an indispensable ingredient of the offenses of indecent liberties with a child or aggravated criminal sodomy." *State v. Nunn*, 244 Kan. 207, Syl. ¶ 19, 768 P.2d 268 (1989). In *Nunn*, the State was permitted a mid-trial amendment to its charging document, changing the charging dates from a period of one month to over a year. The *Nunn* court recognized that the amendment was substantial but found that it did not prevent the defendant from presenting an adequate defense. Because Nunn's defense was simply a general denial and not an alibi, the amendment did not take away his chosen defense and he was not prejudiced: "It was for the jury to determine what weight and credibility should be given to the testimony of [the victim] in light of the changed dates and inconsistencies in the evidence." 244 Kan. at 227.

At the first trial, G.J. testified that she did not recall the exact year of the first instance of sexual abuse. While she stated that she thought the incident happened when she was three, the other details—about the Raiders jacket her mother received around Christmas time—suggested that the incident had actually happened three years later. Despite the amended date range in the complaint, Marks was able to highlight the same inconsistency in G.J.'s recollections again at the second trial. While Marks' defense focused on G.J.'s uncertainty about when the incident occurred, the dates of the crimes were not critical—his defense, similar to *Nunn*, was not an alibi or date specific defense, but was a general denial of the crimes. Marks was not prejudiced by the amendment.

14

The district court did not abuse its discretion by permitting the State to amend its charging document. Time is not an essential element of the offenses of aggravated indecent liberties of a child and aggravated criminal sodomy, and Marks' defense was not date specific. His primary defense simply relied on the inconsistent nature of G.J.'s recollections of when the incidents occurred to support his argument that the State could not meet its burden of proof. Because Marks was not deprived his right to present a defense and the district court's ruling was not unreasonable, we conclude the district court did not err in allowing the State to amend the dates of the charges after the first trial.

*Does the Kansas Constitution provide greater double jeopardy protections than the federal Constitution, prohibiting retrial here?*

Marks argues the Kansas Constitution provides greater protections against double jeopardy than the United States Constitution. He contends the clause at the beginning of section 10—"In all prosecutions . . ."—must be interpreted to prohibit a second trial after a mistrial due to a deadlocked jury, despite caselaw and statutory authority to the contrary. The State contends that Marks' constitutional argument is unpreserved and, even if this court decides to review it, Marks is not entitled to relief.

The Kansas Supreme Court has long held that the double jeopardy provisions of the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights are coextensive. See, e.g., *Kornelson*, 311 Kan. at 715 ("Section 10 of the Kansas Constitution Bill of Rights also contains a protection against double jeopardy that is 'equivalent to the protection guaranteed in the United States Constitution.'"); *In re Habeas Corpus Petition of Lucas*, 246 Kan. 486, 489, 789 P.2d 1157 (1990) ("Section 10 of the Bill of Rights of the Kansas Constitution entitles a defendant to the same protections against double jeopardy afforded under the United States Constitution."). Additionally, Marks acknowledges that his interpretation of section 10—which would bar the State from prosecuting a defendant again following a

15

properly declared mistrial—is contrary to established Kansas Supreme Court precedent. See *State v. McKay*, 217 Kan. 11, Syl. ¶ 4, 535 P.2d 945 (1975).

This court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication that the court is departing from or modifying the rule established. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). Marks fails to show that the Kansas Supreme Court is departing from its recent position regarding the coextensive protections against double jeopardy provided under the Kansas and Federal Constitutions. As such, Marks' constitutional challenge fails.

*Were the charges against Marks brought within the applicable statute of limitations?*

Marks next argues that the State failed to present sufficient evidence that the charged crimes occurred within the applicable statute of limitations. His argument is complex. Under the current criminal code, the State's amended complaint against Marks was filed within the applicable statute of limitations. See K.S.A. 21-5107. Marks argues that because the State's amended complaint alleged that the crimes occurred between April 24, 2011, and December 31, 2014, and the current Kansas criminal code does not apply to crimes committed before July 1, 2011, the applicable statute of limitations was the version in effect in 2010, which would have required the State to bring the charges within five years of the completion of the crimes. The State forcefully argues that Marks failed to raise a statute of limitations issue in district court as an affirmative defense, so he has waived this claim. Alternatively, the State argues that in Kansas a criminal statute of limitations is procedural and an amendment of the statute may be applied retroactively; thus, the charges against Marks were timely filed.

Marks acknowledges that he is raising this issue for the first time on appeal. Marks again tries to circumvent the procedural bar by labeling this issue as a sufficiency of the evidence claim that can be raised for the first time on appeal. He asserts no other

16

preservation exception. The State points out this issue is not a sufficiency of the evidence claim because the date of the offense is not a necessary element of the charged crimes.

Kansas law is clear. A statute of limitations defense is "'an affirmative defense that can be waived' if not pled by the defendant." *State v. Gleason*, 315 Kan. 222, 226, 505 P.3d 753 (2022) (quoting *State v. Sitlington*, 291 Kan. 458, Syl. ¶ 2, 241 P.3d 1003 [2010]). To the extent Marks is raising a statute of limitations issue, his argument is waived and abandoned because he never raised it before the district court.

The Kansas Supreme Court has addressed a similarly framed, statute of limitations-based sufficiency argument in *State v. Valdiviezo-Martinez*, 313 Kan. 614, 486 P.3d 1256 (2021). The defendant argued there was insufficient evidence to show that he committed identity theft on a specific date within the statute of limitations. The *Valdiviezo-Martinez* court noted that the defendant's argument was a statute of limitations defense being raised for the first time on appeal. 313 Kan. at 623. While the court addressed the argument, it noted that it would "leave for another day the job of reconciling the statute of limitations and the affirmative defense cases and of determining whether a sufficiency argument can serve as a vehicle for raising the defense." 313 Kan. at 624. In deciding to address the sufficiency challenge as framed by Valdiviezo-Martinez, the court noted the State lodged no preservation or procedural objections. Here, the State has lodged both preservation and procedural objections to Marks' argument.

The State is correct. Marks' issue is not a sufficiency of the evidence claim because the date of an alleged offense is not a necessary element of the crime. Marks is raising a statute of limitations issue. The statute of limitations is an affirmative defense that is waived if not raised by the defendant in district court. *Gleason*, 315 Kan. at 226. Because Marks has not preserved his statute of limitations-based argument by raising it in district court, we find that the argument has been waived.

17

*Did the district court err in allowing propensity evidence?*

Marks claims the district court erred by allowing the State to introduce evidence about his prior convictions for aggravated indecent liberties with a child because the probative value of the evidence was substantially outweighed by its potential to cause prejudice. The State asserts the district court did not abuse its discretion by allowing the evidence about Marks' prior convictions and, even if it did, any error was harmless.

While the use of propensity evidence is generally prohibited, K.S.A. 60-455(d) permits evidence of a defendant's prior sexual misconduct "'in a criminal action in which the defendant is accused of a sex offense,'" and such evidence "'may be considered for its bearing on any matter to which it is relevant and probative.'" *White*, 316 Kan. at 215. Before a district court admits propensity evidence, the court must consider whether the potential prejudice outweighs the probative value of the evidence. 316 Kan. at 215. An appellate court reviews a district court's decision to admit such evidence for an abuse of discretion. *State v. Claerhout*, 310 Kan. 924, 927-28, 453 P.3d 855 (2019). A judicial action constitutes an abuse of discretion if "(1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based." 310 Kan. at 928. And the party asserting the district court abused its discretion has the burden of showing it. *Peters*, 319 Kan. at 497-98.

As noted above, a district court's decision to admit evidence under K.S.A. 60-455(d) requires a balancing test, weighing the probative value of the prior criminal conduct against the risk that such evidence will prejudice the defendant. *State v. Boysaw*, 309 Kan. 526, 540, 439 P.3d 909 (2019). The Kansas Supreme Court has outlined a list of nonexclusive factors to consider:

18

"In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." 309 Kan. at 541.

Marks focuses his argument that the prejudice caused by the propensity evidence substantially outweighed its probative value on two grounds: (1) his prior convictions were 20 years old, and (2) the evidence distracted the jury from its ultimate task of determining his guilt or innocence in this case. The State maintains that the district court properly found that the evidence would not be overly distracting and took steps to limit the extent of the evidence that could be presented.

The district court held hearings on the State's motion to admit K.S.A. 60-455(d) evidence before each of the two trials. In its initial ruling, the district court addressed the specific concern about distracting the jury that Marks raises on appeal. To allay any potential distraction, the district court determined that the State would be limited to presenting the amended complaint, the journal entry of conviction, and the testimony of the three victims from the prior case. As for the age of Marks' prior convictions the district court noted, "Well, certainly, the age of prior convictions doesn't prohibit the admission of this information. It goes to the weight, not to the admissibility." It cannot be said that the district court disregarded the areas of prejudice Marks raises on appeal.

At the second hearing, which was presided over by a different judge, the district court set forth a more thorough rationale for finding that the probative value of the evidence was not substantially outweighed by its potential to cause prejudice. The district

court found that all four of the probative value factors outlined in caselaw favored admission of the evidence. Its decision is supported by the record.

First, the district court found that the prior criminal acts were clearly proven, as evidenced by both journal entries of his convictions and the testimony of his prior victims. Second, the evidence was probative of the material fact sought to be proved—the State used the 2002 evidence to show Marks' propensity to commit the crimes he was charged with committing against G.J., including the particular way he had orally molested the victims in each case. And the prior conduct made it more likely that G.J. was telling the truth. Third, the material fact—that is, the crimes the State alleged Marks committed against G.J.—was adamantly disputed by Marks. Finally, the district court noted that there was no less prejudicial evidence available.

Turning to the undue-prejudice factors, the district court explained that the likelihood that the evidence would contribute to an improper verdict was not enough to outweigh the "quite high" probative value of the evidence. Next, the district court noted that there was some risk that the jury could become distracted from the central question before it—whether Marks committed the specific crimes against G.J.—because the State's presentation would include additional evidence about Marks' molestation of three other children 20 years ago. But the district court addressed this concern by limiting the amount of K.S.A. 60-455(d) evidence the State could present. Finally, the State's presentation of propensity evidence was brief in the context of the entire trial—the testimony of Marks' two prior victims makes up only 16 pages of the trial transcript.

Marks provides little argument beyond his conclusory statement that "the propensity evidence caused the jury to look past its obligation of unity to convict anyway." The record—and the district court's lengthy explanation of its ruling—shows that the risk of undue prejudice did not substantially outweigh the probative value of the evidence. The district court undertook a meticulous examination of the factors to be

weighed, listing factors on both sides of the equation and explaining in detail why it was admitting the evidence over Marks' objection. As the district court found, the probative value of the evidence of Marks' prior convictions was high. And while there was some risk that the jury might become distracted by the evidence of Marks' prior convictions, it cannot be said that the risk of undue prejudice substantially outweighed the probative value. Finally, the district court instructed the jury how to consider the evidence including an admonition that "[y]ou may not convict defendant of the crimes charged simply because you believe he committed another unlawful act."

A review of the district court's ruling on the State's use of K.S.A. 60-455(d) evidence shows that the district court considered the necessary factors and weighed the probative value of the evidence against its potential for undue prejudice. Marks fails to show the district court abused its discretion in allowing the propensity evidence. Because we find no error, we need not address the State's claim that any error was harmless.

*Did the State commit reversible prosecutorial error during closing argument?*

Marks argues the State committed reversible prosecutorial error during closing argument by implying that G.J. and Mother were telling the truth about his alleged abuses. The State maintains that the prosecutor did not make any improper comment on witness credibility and, even if her comments were improper, any error was harmless.

This court uses a two-step standard of review to analyze claims of prosecutorial misconduct. First, it must determine whether the prosecutor stepped outside the wide latitude afforded prosecutors "to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial." *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022). While this latitude affords the State the ability to highlight evidence and discuss inferences reasonably drawn from it, "a prosecutor may not misstate the law

applicable to the evidence, comment on witness credibility, or shift the burden of proof to the defendant." *State v. Coleman*, 318 Kan. 296, 302, 543 P.3d 61 (2024).

If a prosecutorial error occurred, this court then determines whether the error demands a reversal of the defendant's convictions. Because prosecutorial error implicates a defendant's constitutional right to a fair trial, this court applies the traditional constitutional harmlessness test stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), under which any error may be deemed harmless if the State can demonstrate that there is no reasonable possibility that the error contributed to the verdict. *Coleman*, 318 Kan. at 302-03.

Marks challenges two comments made by the prosecutor during closing arguments:

"*I want to talk briefly about motivation. What motivation does* [G.J.] *have to make up these allegations?* She loved [Marks]. She loved her [Grandmother]. And [Marks] was going to teach her how to drive. A major concern for her during the Safe Talk was that [Marks] cheated on [Grandmother] by doing these things to her. She was very concerned about this. You saw that she was visibly upset during her Safe Talk when she talked about him cheating on her [Grandmother]. *Now, think about what motivation* [*Mother*] *might have to make these allegations up.* She told you that when she got a call from her mom on [G.J.'s] birthday, and [G.J.] said she didn't want to go, this made her angry. She confronted [G.J.] about that, and that's when [G.J.] came forward. [G.J.'s mother] loves her mom. They spent a lot of time with [Marks and Grandmother].
. . . .
"They were family. And had been family since [G.J.] was three. *So ask yourself, what motivation they'd have to make up something like this*. This was a painful and difficult process for [G.J.]. You could see it was difficult during the Safe Talk for her to talk about these things. She gets . . . visibly upset during multiple times of the interview, and she leaves the first interview because it was too difficult. *Why would she put herself through this if she didn't have to*?" (Emphases added.)

22

Marks argues that these comments constituted prosecutorial error because "the State was clearly implying that [his] alleged victim and her mother told the truth." That is, he contends the prosecutor was improperly suggesting that G.J. and Mother were telling the truth by encouraging the jury to question what their motivation for reporting Marks and testifying against him could have been.

While the State is granted wide latitude to craft arguments and draw reasonable inferences from the evidence, a prosecutor cannot tell the jury that a witness is telling the truth. See, e.g., *State v. Hirsh*, 310 Kan. 321, 342, 446 P.3d 472 (2019). Prosecutors are prohibited from expressing their opinions on the credibility of witnesses during trial "because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case. The determination of the truthfulness of a witness is for the jury." *State v. Adkins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014). But Kansas caselaw "distinguishes between arguments expressing an opinion about a witness' credibility and arguments discussing legitimate factors a jury may consider in assessing credibility." *State v. Jordan*, 317 Kan. 628, 648, 537 P.3d 443 (2023). While the former falls outside the bounds of proper argument, the latter comments do not.

In *Jordan*, the Kansas Supreme Court approved a prosecutor's use of rhetorical questions to encourage the jury to consider whether a witness had any motive to be untruthful. 317 Kan. at 649; see also *State v. Ortega*, 300 Kan. 761, 777, 335 P.3d 93 (2014). The court has clarified that "[p]rosecutors may comment on a witness' lack of motivation to be untruthful but must base these comments on the evidence and reasonable inferences from the evidence without stating their own personal opinion concerning the witness' credibility." *State v. Hachmeister*, 311 Kan. 504, 519, 464 P.3d 947 (2020). But when the prosecutor asks rhetorical questions and answers them with a personal comment, the court has found error. *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015).

23

In the portion of the closing argument that Marks highlights, the prosecutor commented, "What motivation does [G.J.] have to make up these allegations? . . . Now, think about what motivation [Mother] might have to make these allegations up." She then questioned, "[A]sk yourself, what motivation they'd have to make up something like this. . . . Why would [G.J.] put herself through this if she didn't have to?" These rhetorical questions are akin to comments made in closing arguments in *Jordan*, *Hachmeister*, and *Ortega*, where no prosecutorial error was found. And the prosecutor did not answer her questions about G.J. and Mother's motivations to interject her own opinion on their veracity, she merely focused the jury's attention to factors bearing on witness credibility.

Because the challenged comments did not seek to bolster G.J. and Mother's credibility with the prosecutor's personal opinion on their truthfulness but an encouragement for the jury to consider their motives, we find that the State did not commit prosecutorial error during closing argument. We need not address the State's alternative argument that any error was harmless.

*Did the district court commit reversible error by failing to give a unanimity instruction?*

Marks contends that the State presented evidence of multiple acts for both alleged crimes, that the State failed to elect which act the jury should agree upon, and that the district court committed a reversible instructional error when it failed to give a unanimity instruction. The State agrees that it presented evidence of multiple acts for each crime charged. The State argues that it made a functional equivalent of an election for the aggravated criminal sodomy count but concedes it made no election for the aggravated indecent liberties with a child count. Finally, the State argues that the district court's failure to give a unanimity instruction was not clear error. In a reply brief, Marks disputes the State's claim that it made an election for aggravated criminal sodomy.

24

In cases that involve multiple acts, the jury must unanimously agree on which act constitutes the charged crime. See K.S.A. 22-3421; *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). To safeguard a defendant's right to a unanimous verdict, when the State presents a multiple acts case, either the district court must give the jury a unanimity instruction or the State must elect the particular act that it is relying on for the conviction. 297 Kan. at 978. Generally, the framework for reviewing alleged jury instruction errors requires this court to ask three questions: (1) whether the party preserved the issue; (2) whether the jury instruction is legally and factually appropriate; and (3) whether any error requires reversal. See, e.g., *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). But when, as here, a defendant challenges the district court's failure to give a unanimity instruction in a case involving multiple acts, an appellate court uses a more particularized test. *State v. Garcia-Martinez*, 318 Kan. 681, 694, 546 P.3d 750 (2024). In such a case, this court will first determine whether the case involves multiple acts. If it does, this court will consider whether an error occurred either because the district court failed to give a unanimity instruction or the State failed to elect which act it was relying on. Finally, if an error occurred, the court determines whether it requires reversal. 318 Kan. at 694.

The parties agree that the State presented multiple acts that could constitute each of the crimes Marks was charged with committing, so we need no further analysis on the first step. Next, the State concedes that it failed to make any election about which act constituted the aggravated indecent liberties with a child count—in other words, the State agrees that an error occurred regarding that count. Despite this concession, the State asserts that it made "the functional equivalent of an election for which act constituted the aggravated criminal sodomy count." The State argues that it elected which act constituted the aggravated criminal sodomy count by describing the events that it would prove to support the charge in both its opening statement and closing argument to the jury. The State contends that in both instances it described the specific incident that occurred around Christmas time in 2014 when discussing the aggravated criminal sodomy count.

25

Kansas courts have considered a prosecutor's comments in opening statements and closing arguments as constituting the functional equivalent of an election by the State. *State v. Moyer*, 306 Kan. 342, 361, 410 P.3d 71 (2017); *State v. Dickson*, 275 Kan. 683, 696, 69 P.3d 549 (2003). But such comments do not always constitute an election, especially when the prosecutor did not explicitly tell the jury which act to rely on. See *State v. Colston*, 290 Kan. 952, 969, 235 P.3d 1234 (2010) (rejecting election argument because the prosecutor did not tell the jury "it could not consider evidence of other acts supporting the same charge or that it must agree on the same underlying criminal act"), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

The State focused the jurors' attention on the Christmas time incident when discussing the aggravated criminal sodomy charge—the charge related to Marks making oral contact with G.J.'s genitals. While the State certainly discussed G.J.'s specific allegation that Marks had taken her to a bedroom, pulled down her pants, and licked her vagina on that occasion, this was not the only evidence of such conduct. In its opening, the State suggested that G.J. would testify that Marks had committed similar acts on many other occasions, claiming he "had done this kind of stuff since she was three." And during closing, the prosecutor—after discussing the Christmas time incident and G.J.'s recollection of Mother's Raiders present that year—stated that Marks "had been assaulting her since the age of three, and it happened a lot, . . . this incident was the first one she was able to articulate." Moreover, despite the State's focus on that one incident, the State never told the jury, during either its opening statement or closing argument, that it had to agree on the same underlying act for the aggravated criminal sodomy count. Because the State alleged that the crime was committed over a three-year period, did not precisely articulate which act constituted the offense, and failed to tell the jury that it had to unanimously determine which act supported the charge, there was no functional equivalent of an election. Thus, the district court was required to provide a unanimity instruction, and its failure to do so constituted an instructional error.

Because Marks did not request a unanimity instruction at trial, this court must determine whether the failure to give the instruction was clearly erroneous. K.S.A. 22-3414(3). The error may be deemed clearly erroneous if this court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. *State v. Trujillo*, 296 Kan. 625, Syl. ¶ 2, 294 P.3d 281 (2013). As the party claiming a clear error, Marks bears the burden to demonstrate the necessary prejudice. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

The Kansas Supreme Court has expressed that it is "less inclined to reverse a multiple acts error where the defendant presented a unified defense, *e.g.*, a general denial." *Moyer*, 306 Kan. at 362-63. As explained above, Marks presented a general denial defense to the State's charges—he simply insisted that he did not commit the alleged crimes and argued that G.J.'s testimony was not credible because her recollection of his alleged conduct was inconsistent regarding the timeline. He did not present any separate defense or materially distinct evidence of impeachment regarding any of the acts alleged. Instead, Marks denied participation in any wrongful conduct with G.J. and attempted to highlight her uncertainty about how old she was when the incident occurred as proof that the alleged conduct did not happen.

On appeal, Marks makes the same argument: "G.J. was inconsistent at all times— 2011 or 2014, for the only detailed incident." He contends that this is the central problem with the district court's failure to give a unanimity instruction: "Some jurors could have believed that the alleged abuse happened when G.J. was three (2011), while other jurors could have believed that it happened when G.J. was six (2014)." But G.J.'s recollections of the Christmas time incident was consistent in all respects except for *when* it happened. G.J.'s testimony did not force the jury to choose between two acts, she testified about one incident that happened when she was either three or six years old.

27

The jury was faced with a credibility contest and had to determine whether it believed G.J.'s account of Marks' conduct or Marks' general denial. When reviewing the entire record, we are not firmly convinced the jury would have reached a different verdict had the district court given a unanimity instruction. As a result, the district court's failure to give the unanimity instruction did not amount to clear error.

*Was Marks denied a fair trial based on cumulative error?*

Finally, Marks claims he was denied a fair trial based on cumulative error. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024). The only trial error we have identified in this opinion is the unpreserved error for the district court's failure to give a unanimity instruction. An unpreserved instructional error is not aggregated in a cumulative error analysis unless it amounts to clear error. *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024). The cumulative error rule does not apply when there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

Marks' cumulative error claim fails. A defendant is entitled to receive a fair trial but not a perfect one, for there are no perfect trials. *State v. Lumley*, 266 Kan. 939, 962, 976 P.2d 486 (1999). Marks received a fair trial.

Affirmed.